The next case is number 07-5058, Moeller Development Corporation against the United States. Mr. Franke, whenever you're ready. Thank you, Your Honor. May it please the court, counsel. Your Honor, we are here today on an appeal on the Winstar case, and I know that this court is familiar with those cases. We have two basic claims, a contractual claim and a takings claim. And while I anticipate that counsel before me has said this as well, there's some unique aspects to this case that are specifically applicable to our claims today. Now, one of the things that you argue is that there was negotiation here over the question of whether this would be characterized as a supervisory merger or not. That's correct, Your Honor. And your position is that that was really a negotiation about whether you could count in goodwill for regulatory capital purposes. And I'm having some problems with that. I know that you have an affidavit from somebody who interprets the regulation that way. But we've said that affidavits from former government officials as to how to interpret regulations don't count. In fact, we've said you shouldn't admit such testimony. So the question is, where in the regulations does it say that you can't use the purchase method of accounting unless it's designated as a supervisory merger? And in particular, I would have thought that you would have to find that in SP 24. Your Honor, and I guess I'm going to flip that on its head, because I don't think that there's anything in the regulation that says you can't use that accounting absent a supervisory classification. However, Your Honor, if you look at CFR 563.13b.7.1 and 3, that defines the capital requirements for merged thrifts based upon combined assets and liabilities, and specifically sets forth the pooling method of accounting of those combined assets. Well, I understand that. I understand there's a pooling method of accounting, and I understand there's a purchase method of accounting. And the purchase method of accounting allows you to count the goodwill as regulatory capital. But I don't see where this regulation, or SP 24, makes the use of the purchase method of accounting depend on whether it's characterized as a supervisory merger or not. It doesn't, except to the extent that the regulations dictate how the accounting is going to be, unless it is classified as supervisory. And then once it's classified as supervisory, that opens the door to supervisory goodwill. I'm not sure I understand that. Where does the... Let's start with SP 24. Does SP 24 say anything about whether a merger is supervisory or not when it's saying choosing between the pooling method and the purchase method? No, it does not. Does the regulation? The regulation at CFR does not say anything about the accounting method, Your Honor, except to the extent that it indicates that the accounting method to be used for a merger of thrifts is the pooling method, and then accepts out for supervisory cases at subsection 3. And that's where you get to that issue of supervisory goodwill, push-down accounting. What you're saying is that the pooling method can't be used if it's supervisory? Well, no. The pooling method is the regulatory requirement for merging thrifts. You accept out of that in supervisory cases. That allows you to use push-down accounting and obtain supervisory goodwill. Just to make sure that I'm not confused, the SP 24 talks about using the purchase method of accounting. Do you agree that the use of the purchase method of accounting allows you to capitalize goodwill? Yes. So what I'm looking for is something that says you can't use the purchase method of accounting unless it's characterized as a supervisory merger. I can't find that. And you have to go back to the regulations rather than the SP in order to find that, and it's at 563.13B7i. Well, I've read that. It doesn't seem to me that it says that. But where does it say there that you can't use the purchase method of accounting unless it's characterized as supervisory? Well, it doesn't specifically say that, but the definition in that talks about that the capital requirements for merged thrifts will be based on the combined assets and liabilities of those thrifts, which is basically a pooling type of accounting on that, Your Honor. It's not a push-down accounting. If you're a supervisory transaction, are you required as a matter of law to use the purchase method? Your Honor, I don't know that you are, but I don't know why. You could use either one. You can use either one, but I don't know why you would use the pooling method of accounting, because the whole purpose... Well, we don't know. If the record is devoid of any interest in using the purchase method for a long-term amort of regulatory goodwill other than the reference to the word it was supervisory, and if it was supervisory, you could use either pooling or purchase, whatever you wanted to use. I think your argument doesn't take you anywhere. If that were the case, I might agree with you, Your Honor, but the fact of the matter is our application set forth very specifically the intent to use push-down accounting, purchase accounting, amortize the goodwill for the straight-line method for an extended period of 22 years. So we have that as the basis, and if you're looking at the elements of a contract in this case, there it is, there is the offer, and... What is the acceptance? Well, the acceptance was the fact that, again... The acceptance, in your theory, would be because they told us they were going to call it a supervisory measure in which we could have either used one form of accounting or the other. Correct, Your Honor. And the reality is, again, this is a unique case. We have individuals who had been working for the bank board immediately prior to this who were consulting with us. We have delegated authority. We have the office in San Francisco telling us to not submit things in writing anymore, that this needs to be negotiated over the telephone. We have a case that doesn't fit this... But the only thing that was negotiated, potentially, was the supervisory designation. There wasn't any negotiation over capitalization of goodwill, was there? There is nothing in the record that indicates a negotiation over that specific element, but as it relates to the supervisory nature of this transaction. And again, Your Honor, what is unique about this is this case didn't fit the supervisory transaction. There was a million dollars paid to the shareholders of Merit Savings and Loan. This is a minority thrift that the FSLIC desperately did not want to fail. There's a million bucks paid. It's not a supervisory transaction. That's why, very early on in the negotiations, this needs to be classified as supervisory. It needs to allow us to use the push-down accounting and straight-line over 22 years. That didn't occur until the very end of the negotiations in June. Let me tell you what doesn't fit. And the government's case is that... We know all of the things that you're telling us seem to be generally undisputed, and it seems very clear that the entire deal turned on the supervisory goodwill. Without that, there would have been no positive balance sheet, no way of going forward. Here we are just weeks before the final enactment of FIREA, maybe days before, a bill that had been pending for a while with a lot of publicity, at least within the quarters in which we're operating. And the government says that if, in fact, everything turned on the supervisory goodwill aspect, how come we don't have that commitment from the government? How come we don't have the contract? How come you're being obliged to rely on takings philosophy because of the absence of a contract? I must say, pointing out that, at this stage, time is of the essence, we don't have time for mail to go back and forth, let's do all of this by telephone, is so curious when there is so much at stake turning entirely on the commitment with respect to the accounting method and the goodwill, and which is explicitly eliminated in FIREA, which is enacted only days later. And here we have all of this up in the air. I couldn't decipher what was actually happening, other than it seemed very strange that the critical point was not, in fact, directly in writing. I appreciate the argument they finally agreed to the supervisory nature, and that entails how the goodwill is accounted for, or that if goodwill can be accounted for. And I understand what Your Honour is saying, and I don't know specifically how to respond to that, other than to say it was in the latter part of June where Mr. Maddox went to Anthony Paula, who at that time they were negotiating with, and said, we were negotiating forbearances, and we had offered three, they had limited that to two, and actually then limited it to one, and we said, but we need to have this be a supervisory transaction. That's the number seven that was in writing to Anthony Paula, which ultimately they agreed to in writing, and said, yes, we will classify this as a supervisory transaction. Again, the accounting method was specifically laid out in the application, and I agree, there was really no dispute about our application of that accounting method with respect to that specific issue. It was all about whether or not this would be a supervisory case which created the supervisory goodwill that we were going to use under the accounting method. But you could have the purchase accounting without including supervisory, without including goodwill, as it had traditionally been accounted for, for the failing shrifts. You could, Your Honour, but it would not, what was happening was we were deviating from GAAP, and that's what all of the WMSAR cases are, that you deviate from GAAP, and therefore that's not regulatory, it has to be contractual. And that's the whole point. Yes, you could use the purchase method of accounting, but in the circumstances where you're looking at amortizing goodwill over an extended period of 22 years, that deviates from GAAP. That is where there is a distinction between using it typically or using it in this situation. Is there any contemporaneous document that suggests that the supervisory designation had anything to do with goodwill? I can't point to one in the record, Your Honour. At this point, I'll reserve the rest of my time. Yes, let's hear from the other side. Thank you, Mr. Franklin. Mr. Rivera-Vandekar. Thank you, Your Honour. And may it please the court, the trial court erred in dismissing Mola's complaint, first because it was untimely filed. Then the trial court correctly concluded that Mola's contract in taking his claims failed. I'd like to turn just for a little bit to the cross appeal first. Pursuant to our cross appeal, this court's opinion in the Bank of America case requires that the case be remanded for entry of dismissal for Mola's failure to meet the statute of limitations. In Bank of America, this court ruled that when regulators take specific action contrary to the thrift's existing contract prior to the effective date of FIRA's implementing regulations, that they breach the contract. In that case, although goodwill did continue to count. Yeah, in Bank of America, there was an express order from the agency for the bank to do something like right now. Right. And then an October date. That is correct. Regulator said, Bank of America, you do this right now. Where is the comparable order from the regulator to the SNL in this case? On July 31st, 1981, I read them a letter. And they said, FIRA hasn't been enacted yet. It may or may not be enacted. You've earlier been designated as a troubled institution. Under the old existing rules, we'd like you to do some things. Right? The letter said, right now, effective immediately, you have to stop growing. And it said you have to stop growing because capital, for regulatory purposes, would not consist of goodwill. It would only be tangible capital. We'll look at tangible capital. That's what the regulator said. And we'll consider that this thrift is troubled because of that. If the plaintiffs had a contract, and we're not conceding that they do, if the plaintiffs have a contract to count goodwill towards regulatory capital. You can't have it both ways. And they make this argument, I think, quite forcefully. If you agree they have a contract, and then we debate about whether this was a breach, or there wasn't a contract, in which case we look at whatever else took place. It's true that we can't have it both ways, Your Honor. But the point that I'm making relates to a motion to dismiss. When we move to dismiss, we take all of their allegations. Particularly when you want to impose limitations so they can't even get into the courthouse door, you need to have a firm position as to what's wrong. Well, we have three positions as to what's wrong. Are they conflict? They do not conflict, Your Honor. It's perfectly consistent to say we assume for the purposes of the statute of limitations, which is an antecedent argument, that all of their allegations are true. Then, if that turns out not to be correct, and this court disagrees with that, then we would say that there is no contract, because the evidence does not demonstrate it, and that there is no taking. Now, with respect to the contract. I'm having trouble seeing how this July 31st letter said you can't use goodwill anymore because of FIREA. Where does it say that? Well, it says it at page A200, 656. But FIREA hadn't been enacted. Even if FIREA had not been enacted, Your Honor, it would have been a breach of contract. And that is because, let's assume 600, how much? 656. 656. That is the part of the letter that demonstrates that there are effective immediately until further notice. Where are you reading from? I'm sorry. This is the second full paragraph that starts, until such time. And the second sentence says, effective immediately until further notice, charter is directed to ensure that an increase in assets or liabilities facilitates no other purpose than to, and then it gives the four restrictions that charter would be subject to. But how's this related to FIREA? I believe it's two pages earlier, or I should say one page earlier. There is a discussion of tangible capital. And it's tangible capital that's looked to in determining whether RB3A1 is going to be served. Where is that on the preceding page? If you look at the very first paragraph on 654. 654. That's right. I'm sorry. It's two pages before. And if you look at it. The we have determined paragraph? The we have determined paragraph, the second sentence. As detailed in our report of examination as of April 24, 1989. Serious concerns. Serious concerns regarding your institution's level of tangible capital. That's not capital. That's not regulatory capital that counts goodwill. Well, where's this tied into FIREA? Well, it's tied into FIREA, Your Honor, because there are statements later on in this letter. Where? That's what I'm looking for, Your Honor. That discuss, I see. I'm sorry. Back at page 656. On page 20, it says, beginning January 1, 1990. Charter's going to have some new obligations. Charter's, yeah. Charter's obligations respecting whether goodwill would count towards the formal regulatory capital measure, which certainly began then. But the point with respect to Bank of America, Your Honor, is that on October 6, 1989, which was the date at which something was required to happen in Bank of America, that regulatory capital reporting still could include goodwill. But there was nevertheless a breach, because goodwill was not counted towards regulatory capital for the respective purpose, for the specific purpose of counting, of allowing a branch acquisition. Right, but the problem I'm having, and perhaps other members of the panel are having, is in finding in this nice July 31 letter what you say is in here. Well, if you go back to the page 656 at the top, that's where the discussion of FIREA is. And it talks about it countenances tangible capital, the tangible capital requirement in FIREA. It says it will require. Will. That's true. It hasn't been enacted. It hasn't been enacted yet. Does it say the effective date? The effective date, well, I don't think it does say the effective date, because it hadn't been enacted yet. It was enacted. But you're saying, nonetheless, this was a breach. It was a breach. They could have come into court the day after this and sued for breach of contract based on this letter? Well, yes, Your Honor, because that's when they thought the breach of contract had actually taken place. September 14, 1989, they have a letter back responding to this letter. And in it, they say that the sanctions violated the contract, the terms of the acquisitions, they understood them. Because they imposed the tangible capital requirement as capital was understood under RV3A. The point is, Your Honor, twofold. Number one, FIREA is countenanced in this letter. And it's because FIREA, they knew that there was going to be a tangible capital requirement under FIREA, that they decided to look to tangible capital to exclude goodwill from regulatory capital. But the second point is, even if FIREA had not motivated goodwill from not being counted in regulatory capital, so long as goodwill isn't counted towards regulatory capital, it's a breach, regardless of what modes it motivates it. So for those reasons. When you make arguments like this, just as they make this argument about takings, it sort of makes you wonder whether the other argument has much merit. When you make an argument like this about the statute of limitations, you have to wonder whether you have confidence in the merits of your argument that you won on before the Court of Federal Appliance. Your Honor, I was about to turn to those arguments. And I certainly do have confidence in them. With respect to the point on the contract, the trial court correctly concluded that there is no material fact that demonstrates that there was ever either a request or a grant of an extended period of goodwill, amortization, or any kind of government bearing of the risk of regulatory transfer. Does supervisory designation have anything to do with the use of the purchase method of accounting? Absolutely not. The supervisory designation, if one looks at the regulation that the plaintiffs themselves point to, 563.13.B7, in there, all it says is that regulatory capital will be measured based upon the combined assets and liabilities of the thrift, of the thrifts to be combined. Well, your adversary says it's subsection 3, that regulation that we worry about. What does subsection 3 say? Subsection 3 says that if you count something as supervisory, the regulators are permitted to grant forbearances. Just forbearances, that's all it says? That's right. That's all it says. And one can look at that at 207.20, I think, is where that is in the joint appendix. The point is that the supervisory goodwill is a very specific term, which authorizes a very specific accounting system. And you're saying the supervisory has nothing to do with it, and goodwill has nothing to do with it. No, Your Honor, I'm not saying that supervisory has nothing to do with the transaction. But what happened in this case is that the transaction Supervisory goodwill. Supervisory goodwill, explicitly, is a term that only came about in FIREA itself. Before that, there was goodwill or other assets that there wasn't supervisory goodwill. But with respect to that. Are you sure? It seems to me that Winstar used the term supervisory goodwill before FIREA was enacted. I don't believe that that's accurate, Your Honor. I think that supervisory goodwill was a term that was explicitly explained in the Winstar opinion as relating to that term as it was created for the first time in the FIREA statute. Of course, but everyone knew what it meant. It was the accounting system that allowed the goodwill to be counted as in meeting the capital regulatory requirements. I think that's right, Your Honor. I'm just saying that the particular semantic term supervisory goodwill is not really an issue in this case. The question is whether goodwill or was any forbearance with respect to goodwill. Forbearance with respect to goodwill means treatment of goodwill that's not authorized by GAAP. That's right. The regulations incorporate and specifically say we will account for mergers pursuant to GAAP. All that the plaintiffs got with respect to their goodwill was the standard regulatory treatment of it. They didn't even ask for any deviation from it in their HE3 application. But they were counting the goodwill and meeting their capital requirement. That was the reason, as I read this letter of July 31st, for the objection. Because they were treating the supervisory goodwill as it has been treated in the Windstar cases. They did count goodwill towards regulatory capital. But that's no different from many of the other mergers that took place in which there was no contract. And you're saying that it was authorized by GAAP. It certainly was, Your Honor. That's the standard treatment under GAAP as incorporated under the regulations under SP24. Indeed, that regulation actually says that the purchase method, which gives rise to goodwill, is the default method by which mergers are going to take place. The other arguments that the plaintiffs have raised with respect to the existence of a contract, there being something more, that is, something more than a mere regulatory approval as required under the statute, they fail. They state that because of a two-year forbearance that may or may not have been granted with respect to scheduled and classified assets, that any goodwill treatment must have been contractual. That can't be right. That most, all that that demonstrates, the existence of a two-year forbearance with respect to scheduled and classified assets, is that. But they didn't get that forbearance either. Well, we don't believe that they did. In fact, it's not listed in the June 24, 1987 regulation. I mean, when they were closed down, it was ignored. But it did look as if those 22 months were agreed to. That's right. All of the forbearances listed in the 83 application were not agreed to. So that's more of an indication that there was no special treatment given this thrift under the regulations. But in any event, that specific idea, that two-year forbearance with respect to something else pertained to goodwill, has to fail. The other alternative argument that they raised, that they were given on a regular basis. But what else if it was the goodwill which accounted for it meeting the regulatory capital requirements? Then necessarily, that's what the forbearance referred to. Because without the goodwill, and without the purchase method of accounting, there wouldn't have been a need for a forbearance. You didn't need a forbearance in order to count goodwill towards regulatory capital, even if absent goodwill, you wouldn't meet the regulatory capital requirement. In other words, this was a standard way for goodwill to count towards regulatory capital under GAAP and under the regulations. With respect to the amount of goodwill in regulatory capital, there is no indication that there was any more goodwill that was permitted here than would have been permitted under GAAP. Alternatively, so what would the forbearance be necessary for? Extended period of amortizing the goodwill? That or, as was found in the hometown case, that the government assumed the risk explicitly of not changing the regulations with respect to goodwill. Neither of those were even requested in this case. Alternatively, even if a contract did exist between the government and charter, MOLA wasn't a contract party. Because in this case, it's just like BLAST. The shareholder initiated the acquisition, signed the application, and recapitalized the thrifts under the term of the acquisition. But it was not a contract party because it shielded itself from contract liability by going through another process. Well, if we came to that issue, shouldn't we vacate and remand? The court better claim didn't address that issue? I think it can be decided as a matter of lawyer. Because it is a question of Well, aren't there some factual considerations? There are factual considerations. But because this case is just like BLAST, there really isn't any distinction between the facts of this case and the other cases, such as BLAST, Horns, and Kane, in which this was disposed of. I'd like to quickly talk about the liquidation surplus point, because I know I won't be able to talk about it in rebuttal. With respect to that point, there is no liquidation surplus. Page 200, 462 shows a negative receivership amount of $44 million. So there's nothing to return to MOLA. What you're saying is they actually made a little cash during the liquidation, but then it all was exceeded, they actually? Exactly. That's precisely what that document says. I'd like to save the remainder of my time for rebuttal, Your Honor. What are you going to rebut? Well, should the plaintiffs have anything to say about the statute of limitations argument, I'd like to be able to briefly discuss that. OK. And inevitably, I do have something to say about the statute of limitations argument. Your Honors, I believe Bank of America, too, specifically, disposes of that issue. Because if you look at the facts in Bank of America, too, Honolulu Federal, HonFed, was subject to liability growth, investment limitations, until they met FIREA's tangible capital requirements under a letter that was presented prior to the specific agreement which they entered into with the Feds in terms of the merger. The court in Bank of America, too, rejected that and said that did not trigger the running of the statute of limitations. I think that's dispositive. It's directly on the court's purposes. Do you interpret the BMA opinion, the majority opinion, to foreclose this panel from being able to determine that the passage of FIREA started the statute to run? In terms of the mere passage of it? Well, that's what the government wants. Well, yeah. I mean, I think Winstar. And their briefing suggested that's what they want. Winstar, as law of the case, precludes. And the BOA, I think, precludes that, as well. I mean, it specifically says that in BMA, the majority opinion didn't expressly reject Judge Mayer's dissent. They didn't. But they took into account there's nothing with respect to the enactment that has any impact whatsoever on the parties. And in Winstar. I'm just asking about one panel is bound by another. And so my question is whether or not we ought to be reading the majority opinion in BMA to say, Chief Judge, Judge Mayer was wrong. And the enactment doesn't trigger the statute. If the enactment had triggered the statute, if that were possible, then the majority ruling in BMA would be wrong. Well, that's correct. And the Supreme Court ruling in Winstar would be wrong, as well, which they specifically said it was not until the specific application of FIREA to the institutions, the point at which they failed, the point at which it went to the contract. I do want to speak very quickly to the takings issue. The government's argument throughout is, actually, for the first time, is there is no surplus. That was conceded below. There was no evidence that there wasn't any surplus. The unique thing that this court has to look at is the FDIC's departure from this case. And the FDIC's departure attempted to foreclose any claims that might be based upon or derivative of the FDIC's claims. If there is a receivership deficit, that is the FDIC's receivership claim. The government can't wear two hats. They presented no evidence. They presented no testimony. They didn't even argue to the contrary at the court of federal claims level that there was not a surplus that existed. There is a liquidation surplus. It's over $6 million. The takings claim is substantiated because that is a different property interest than the contract, and that's why that should be sustained. Thank you, Mr. Franklin. Okay. Do you have a few seconds on the statute of limitations? Thank you, Your Honor. Very briefly, the August 28, 1989 letter in the Bank of America case is not like the July 31 letter in this case because it only talked about proposed limitations. Second, with respect to the question about the Bank of America case, you're right, Your Honor, that the majority opinion didn't address whether FIREA's enactment was a breach, and the Winstar Supreme Court opinion didn't talk at all about the statute of limitations. Thank you, Your Honor. Okay. Thank you both. The case is taken under submission.